Den, ex dem. Hinchman, v. Clark and Zilcar.

## DEN, ON THE DEMISE OF HINCHMAN, v. CLARK AND ZILCAR.

1. A devised in these words : "*Imprimis.* I give and bequeath unto my eldest son, B, three hundred acres of land, &c., to hold the said three hundred acres unto my said son, B, and his heirs, lawfully begotten, and to be begotten, forever; but if it should so happen that my said son, B, should die and depart this life without such lawful heirs, as abovesaid, then the above devised premises shall descend to my son, C, and his heirs, forever." *Held,* that B took an estate tail under this devise. The acts of assembly of August 26th, 1784, and March 23d, 1786, for enlarging estates in tail into estates in fee simple, in the second descent, are confined to those holding in descent from the first donee, and do not extend to a purchaser of the forfeited estate of the second in descent.

2. A tenant in tail, by committing treason, forfeits his life estate only.

In ejectment for land in Gloucester county.

This case was tried at the June Assizes, in 1794, when a special verdict was found by the jury, the important circumstances of which are—

John Hinchman, (the first,) was seized in fee of the premises in question ; and by his will, dated October 15th, 1713, devised the property in controversy to his son, John Hinchman, (the second,) in these words : " *Imprimis.* I give and bequeath unto my eldest son, John Hinchman, three hundred acres of land, &c., to hold the said three hundred acres unto my said son, John Hinchman, and his heirs, lawfully begotten, and to be begotten, forever; but if it should so happen that my son John should die and depart this life, without such lawful heirs as abovesaid, then the above devised premises shall descend to my son, Joseph Hinchman, and his heirs, forever." John Hinchman, (the second,) the devisee in the foregoing will mentioned, entered on the property, and died seized, on the first day of November, 1755. He died intestate, leaving issue, John Hinchman, (the third,) his eldest son, and William Hinchman, the lessor of the plaintiff. John Hinchman, (the third,) entered on the lands, and while

seized of [341] them, joined the British armies. An inquisition was taken against him in August, 1778, and final judgment by default was entered against him in December Term, 1778. Under this inquisition and judgment, the property was seized by the commissioners of forfeited estates, and all the right and title of John Hinchman (the third) in the premises was sold to Elijah Clark, one of the defendants, and conveyed to him by deed dated September 7th, 1779. Zilcar claims under Clark, as his tenant. John Hinchman (the third) died intestate and without issue, July 1st, 1789, leaving William Hinchman, the lessor of the plaintiff, his brother and heir-at-law.

On this special verdict, three questions were raised—

1st. What was the nature of the estate which passed by the will of John Hinchman (the first) to his son John Hinchman (the second.)

2d. If an estate tail, whether John Hinchman (the third), by his conviction for treason, forfeited the inheritance, or only his particular estate for life, in the premises; and—

3d. If the inheritance was not forfeited, then whether the act of August 26th, 1784, and the supplementary act of March 23d, 1786, did not vest a fee-simple in Elijah Clark, the purchaser.

*Leake* and *Aa. Ogden,* who argued for the defendant, contended, on the first question, that John Hinchman (the second) took an estate in fee-simple, under the devise from his father, which descended to his son John Hinchman (the third), and was forfeited by his treason. If this was the case, as all the estate of the convict was conveyed by the commissioners, the estate became absolutely vested in fee-simple in Elijah Clark, the defendant.

On the third question, they maintained that, supposing the estate an entail, and the inheritance not absolutely forfeited by the commission of treason, yet that the acts of assembly passed before the death of John Hinchman (the third) oper-

ated to the use of Elijah Clark, the purchaser of his right, title, and interest in the premises, and vested the fee in him; that Clark, under the conveyance, stood precisely in the place of Hinchman, the offending tenant in tail; that under these acts [342] of assembly, Hinchman would have become seized in fee-simple, had not the forfeiture intervened, which forfeiture and sale transferred to Clark all the interest which he had both in possession and possibility.

The principal point, however, labored by the counsel, was the second question, on which they contended that the inheritance itself was forfeited to the estate by the treason of Hinchman, and, being vested in Clark by the conveyance from the commissioners, would continue in him and his heirs so long as any issue in tail of the original donee remained.

They argued that a fee-tail is a single and indivisible interest vested in estate and tenure in the donee as absolutely as a fee-simple, but limited to descend to certain heirs. It is an estate of inheritance as contradistinguished from an estate for life, and it seemed a novel and preposterous idea to divide it into two parts—one an estate for the life of the tenant in possession, which might be forfeited, and the other, the inheritance, as resting in him not in interest, but as a deposit for the benefit of the heir in tail. This distinction, upon which, however, all the argument for the plaintiff rests, is altogether arbitrary and unfounded in principle or precedent. A fee-tail is, in definition, in estate, in descent, and even in conveyance by the tenant, as entire and indivisible an interest as a fee-simple. If this be the language of the law, then the whole estate or none, must be forfeited under the act of assembly, because the distinction contended for was neither created nor recognized by the legislature. It is not contended by the counsel that there is no forfeiture. They admit that, to a certain extent, estates tail fall within the terms of the act, and it is, therefore, necessary for them to establish this distinction, certainly unsupported, if not contradicted by the writers on the subject. 2 *Bl. Com.* 104, 109, 112.

There is nothing in the act of assembly which militates against the doctrine for which we contend, or which supports the distinction which it has been attempted to draw. The act of December 11th, 1778, ( *Wilson's Laws* 67), under which this estate was forfeited, expressly says, " that all and singular the land, te-[343]-nements, and hereditaments held in fee, or for term of life, and generally all the estates real, of what nature or kind soever they may be," etc., section 1. The word fee used in this section, is descriptive of, and includes as well fee-tail as fee-simple; it is not restrained by the legislature to fee-simple, and under what rule of construction can the court intend that they designed to include fee-simple and exclude fee-tail? The fair inference is, that by employing a word of general signification, they intended to embrace all fees. *Jac. L. Dic., verbum "Fee,"* proves that the word fee includes fee-simple and fee-tail. In common parlance, when an estate in fee is spoken of, it is understood as applying to either species.

If any doubt could exist, with regard to the extent of the signification of this word, it must be terminated by a refer-ence to the words immediately succeeding, " and for term of life." This expression shows that the intention was to confiscate all freehold estates, whether in fee or for life.

If this extensive signification of the words " estates in fee " be correct, it will afford a sufficient answer to a distinction which the counsel have endeavored to draw between the act of assembly, and the statute of Hen. VIII., under which it has been adjudged, that by the words " estates of inheritance," an estate in tail was included. According to the common form of expression among lawyers, as well as others, the word " fee " is equally extensive in its signification as " inheritance ;" and the phrases " estates in fee," and " estates of inheritance," are perfectly synonymous.

This imaginary distinction has been further strengthened, according to the ideas of the learned gentleman, by the consideration that a tenant in tail, by his grant or conveyance, could only pass an estate for his own life, and that, as his

power over the estate terminates with his life, all devises of such an estate must be nugatory. To this, however, it is sufficient to answer that by his feoffment, in fee or in tail, he does, in contemplation of law, actually pass a greater estate than merely for his own life; he actually conveys by such feoffment, with livery of seizin, a base fee, which includes all the rights and incidents of the estate, as they existed in the tenant in tail, until defeated by a *formedon* of the issue. If, by a release, grant, [344] confirmation or devise, no discontinuance is worked, so as to drive the issue in tail to his *formedon*, it arises from the particular character of those conveyances, and not from any deficiency of power in the tenant.

But when the legislature have in specific terms declared that all and singular the lands, tenements, and hereditaments held in fee," should be forfeited, it would amount to a judicial repeal of the act if the court should say that estates in fee-tail should not be forfeited. With equal propriety might it be said that estates in fee-simple should be excepted, since the words used were equally applicable to both.

As if, however, to guard with as much caution as possible against such a misconstruction of the act, other words are superadded, which ought forever to settle the question. In the very same section of the law, after mentioning estates in fee and for life, it is added, " and generally all the estates real, of what nature or kind soever they be, within this state, belonging to such fugitive or offender." If these words have any meaning, they must necessarily embrace the estate which Hinchman had in these premises. They are decisive of the intention of the legislature (an expression which makes so important a part of the argument for the plaintiff,) not to spare any species of interest or estate, of which the offender might be legally seized.

Should doubts, however, still exist, we find other words extending the forfeiture to " any estate of which the offender was seized, or possessed of, interested in, or entitled unto, in his or her own right, or to his or her own use." The argu-

ment of the learned counsel must go so far as to prove that a tenant in tail in possession, is not "seized of, or interested in," the inheritance of the estate tail, in order to avoid the operation of these most extensive and significant terms.

It is to be observed that the legislature have studiously employed words which could not be narrowed down by construction. They say "all hereditaments," a term which includes in its legal signification, not only the thing, or subject of ownership, but when used as a word of grant or forfeiture, carries with it the interest or estate in the thing granted. 2 *Mod.* 132; 2 *Bl. Com.* 17; *Jacob's L. Dict., verb.* "*Hereditament.*"

[345] With regard to the *quantum* of the estate which was conveyed to Clark by the state, it was contended that it did not amount to anything more than an estate for the life of John Hinchman (the third). If the previous points have been made out to the satisfaction of the court, this objection may readily be obviated. If the estate was in reality forfeited, and has not been conveyed to Clark, it remains in the state, and the plaintiff in ejectment must recover on the strength of his own title, not on the weakness of ours. It is a good defence if we show the title out of him. *Running* 119; *Bull. N. P.* 116, 117; 1 *Wils.* 72; 2 *Esp.* 169.

But there is nothing in the words of the law which can authorize or support such an inference. The section which directs the conveyance to the purchaser is to the full as comprehensive as that which contains the clause of forfeiture, and tends to confirm the construction which has already been given to that part of the law. The words are: "The commissioners shall grant and convey to the purchaser all the right, title, interest, property, claim or demand whatsoever, either in law or equity, which the person forfeiting had, or ought to have had, in and to the said bargained premises at the time of committing the offence." (§ 10.) What, then, was the estate, right, title and interest? was it not an estate of inheritance in fee tail? If so, this was the very estate directed to be conveyed to the purchaser; if it was conveyed it must have

been forfeited; and if forfeited the issue in tail are forever barred.

In the same section it is further enacted that "by this deed the purchaser shall in every case be and is hereby declared to be vested in as good and perfect an estate in the said bargained premises as the person forfeiting had, &c.; and shall have, hold and enjoy the same as fully in every respect as the person forfeiting held, or might, or ought to have held the same, at any time before committing the offence." Under these words the purchaser has as good and perfect an estate as the offender; and it is admitted that the offender had an estate of inheritance—the inheritance, therefore, was forfeited.

[346] It is a rule of construction that where the words of a law are ambiguous, we are to look, in the first instance, for the objects which the legislature are presumed to have had in view; to ascertain their precise intentions, and to give such a construction, if possible, to the words which they have employed as will tend most effectually to further these views. The words used are to be taken in their popular and not their technical signification, as in the construction of deeds, wills, &c. 3 *Mod.* 45-6; *Cowp.* 306, 659. These cases prove that the words "estate, hereditament, interest, seized or possessed of," are equivalent and coëxtensive with any technical or formal words that could have been selected.

The plaintiff may, therefore, be allowed his option whether the words shall be construed according to their strict or their popular signification. If he selects the former, it has been clearly proved that the words "estates in fee" include estates tail; if he prefers the latter, it is not less obvious that the expressions "all estates, of whatever kind or nature, all his interest," &c., are sufficiently comprehensive to include every species of estate of inheritance.

But, leaving this kind of reasoning, there are express authorities bearing immediately upon the question. The case of *Capt. Gordon, Foster* 95, is in point. In that case, Sir Wm. Gordon, who was seized of an estate in tail male, was

attainted of treason, and, after a strenuous opposition, the court held "that the estate and interest in the barony and lands in question, which was forfeited to the crown by the attainder of Sir Wm. Gordon, was not only during the life of Sir William, but so long as there shall be any heir male of his body." The same doctrine is also reported to have been held in *Mercer's case, Ib.* 102 *nota;* (see, also, 4 *Com. Dig.* 231, *tit.* "*Forfeiture,*" *B* 1, *S. C.;*) and in the case of *Brown* v. *Waite,* 2 *Mod.* 130 ; 1 *Ventr.* 299 ; 2 *Lev.* 162. That was a special verdict by which it was found that Danvers, the tenant in tail, was guilty of high treason, and died. Afterwards, an act of parliament was passed, which, reciting that he had committed the crime of treason, enacted "that all the lands, tenements and hereditaments held by him," on a [347] specified day, should be forfeited to the king. The case is precisely the same with that now before the court, in all its circumstances, excepting that the words used in the act of assembly are far more comprehensive than those in the act of parliament. It was there, however, holden that the estate tail was forfeited under these words, and, unless some strong grounds are urged against that judgment, its authority should receive the sanction of the court in this case.

An attempt has been made to enlist the feelings of the court on the side of the plaintiff, by urging the hardship to which he is exposed. Such appeals are generally the last resort in cases where parties and counsel are fearful of relying upon the judgment of the court, and usually betray the weakness of the cause they are employed to support. If there is any legal effect to be given to this part of the argument, it would operate equally against every species of forfeiture under any circumstances that might exist, since it would be difficult to imagine any case in which forfeiture should amount to anything more than a formal disposition of property, in which it would not operate upon innocent persons, and be productive of individual distress and hardship. This ground of objection is fanciful and visionary ; it applies to almost every species of punishment, and, if adopted,

would lead in its consequences to the most disastrous or absurd results. It will be sufficient to answer this reasoning in the language of the author of the *Principles of Penal Law* 40: "We must not argue from special cases against general systems. Perfection unexceptionable cannot be the result of human dispensations; and it would turn this beautiful fabric of our liberties to a fantastical, confused scene of preposterous distinctions, if it were allowable to set up personal compassion and private hardship in opposition to the consistency of legal principles." *Blackstone, 4 Com.* 382, strongly approves of the propriety of this principle of forfeiture.

But, whatever may be the private inclinations of the court, they are to remember that the act of 1778 is the law of the land; no relaxation of its provisions can be made here; if the law applies to the case, all that the court have power to do [348] is to pass judgment as the law directs, and leave compassion to operate in the way which the constitution provides.

But, admitting for a moment that the words in the act of assembly are not sufficiently comprehensive to bear us out in the interpretation we have given, still, as Hinchman has been convicted of treason, all his estates, whether of inheritance or not, are forfeited to and vested in the State of New Jersey, either, first, by the common law; or, secondly, by the *Stat.* 26 *Hen. VIII.*, under which entails are held in England to be forfeitable. Hawkins says: "It seems agreed that, by the common law, all lands of inheritance whereof the offender was seized in his own right, are forfeited to the king by an attainder of high treason." 2 *Hawk.* 366, *b.* 2, *c.* 49, § 1. To the same point is 1 *Hale P. C.* 240; 2 *Bl. Com.* 211.

If estates tail are not forfeitable for treason by the common law, the *Stat.* 26 *Hen. VIII.*, c. 13, has been construed to embrace them. Since the passing of this statute, which has always been understood as extending to this country, there cannot exist a doubt upon the question. 1 *Hale* 241; *Co. Litt.* 272, *b., n. b.*; 2 *Bl.* 112, 117, 118, 9; 4 *Com. Dig.* 230, 1; *Foster* 95; *Cro. Car.* 430.

*Griffith*, in reply, conceived that a serious doubt could scarcely be entertained as to the nature of the estate raised under the devise of 1713, for it had been repeatedly held that a devise to " one and his heirs lawfully begotten," creates an entail. 3 *Com. Dig.* 426, " *Devise*," *N* 5. But the intent to give an estate tail to the devisee is reduced to a certainty by the subsequent limitation in favor of Joseph, in case John should die without such heirs. The failure of heirs contemplated by the testator, was of such as were the issue of John, for' there could be no failure of his general heirs while his brother Joseph lived. *Fearne on Cont. Rem.* 350. Unless, therefore, this be construed an estate tail, the general intent of the testator will be defeated ; for, if John did not take an estate tail, then the limitation over to Joseph must be void, as being too remote, after an indefinite failure of heirs. *Fearne* 322.

It is evident, also, from the other clauses in the will, that the testator knew perfectly well how to create an estate in fee, [349] and it is manifest that he intended to give John an estate different from that given to Joseph. But this part of the case is fully settled by repeated adjudications.

It has been contended that admitting the offender to have had an estate tail, and not to have forfeited anything more than his own interest and rights in the sense contended for, yet as by the acts of assembly of August 26th, 1784, and the supplement of March 23d, 1786, John Hinchman, (the third,) had he not forfeited, would have become seized in fee-simple, Clark, the purchaser under the forfeiture, stands in his place, and is entitled to the benefit of those acts.

It is somewhat difficult to comprehend how a purchaser of the estate of the offender in 1779, which was then a fee-tail, should in 1784 claim a fee-simple in the property under an act of assembly, in which the estate which he has is neither enlarged nor mentioned.

The acts in question, so far from admitting of such a construction, expressly negative it ; they were intended to operate, and by the words employed, can operate only in favor of

the actual heir in tail, and exclude, so far as language can do, any person claiming out of the line of descent.

The preamble expresses the hardship to be on heirs in suing out common recoveries.

The enacting clause and the proviso are so full and decisive, as to preclude the necessity of argument. The second section, with the explanation in the supplement, reads thus : " All lands or other real estate which have heretofore been devised in tail, and have, agreeably to such devise or entail, been possessed by the first devisee in tail, and are now the property of the next devisee in tail, after the decease of the first devisee in the line mentioned in the devise, all such land or other real estate shall be deemed, taken and adjudged to be the proper estate in fee-simple of the present possessor, provided the testator under whom the same is held had an absolute estate in the same, and provided that the person in possession holdeth the same in the line of entailment mentioned and directed in and by such devise in tail." Now, in order to have the benefit of this act, Clark must prove that he is " the next devisee in tail—in the line mentioned in the devise in tail," and that " he holdeth the [350] same in the line of entailment mentioned and directed in and by such devise in tail." These are the guarded expressions of the law, and in the strongest manner negative the construction which it has been attempted to put upon it. In fact it is not necessary that the words should have been selected with so much caution, after having spoken of the devisee and possessor in tail, since by the common law none can be such tenant in tail except the donee and his issue ; and, therefore, there could have been no misunderstanding of the meaning of the legislature. *Cro. Car.* 430, *Stone* v. *Newman.*

Having thus far answered the positions assumed by the counsel for the defendant, another question remains of more importance, and which has been labored with much ingenuity and ability—whether by a conviction of John Hinchman, as a refugee and traitor, or by the terms of the act of Decem-

2 c

ber 11th, 1778, the issue in tail after his death is deprived of the inheritance limited to them under the will of 1713.

The proposition thus stated embraces two questions.

1st. Whether the conviction and judgment against John Hinchman, independent of the act of assembly, effected a forfeiture of the inheritance.

2d. Whether it was forfeited by the act of assembly.

It becomes necessary to enter upon the first inquiry in consequence of an attempt which has been made on the part of the defendant, to prove that either by the common law, or by the Stat. 26 *Hen. VIII.*, this estate, without any declaratory act of the legislature, instantly became forfeited to the state upon the conviction, to the exclusion of the issue in tail.

The learned counsel seems indeed to have forgotten his accustomed accuracy, when he stated that by the common law an estate tail was forfeitable for treason, when it is one of the most familiar doctrines of the law that no such estate existed at common law. This species of estate was created in the year 1285, by the statute 13 *Edw.* I., *st.* 1, *c.* 1, by the very terms of which it was protected against forfeiture, and so remained until the statute 26 *Hen. VIII.*, a period of two hundred and fifty years.

The history of this estate is given circumstantially and accurately by Blackstone, from which it appears that fees con-[351]-ditional at the common law, became fee tail by the statute *de donis;* that at common law the conditional fee became, by the birth of issue, unfettered to certain purposes, one of which was, that it became forfeitable for treason. The estates tail were first subjected to forfeiture by the statute 26 *Hen. VIII.*, *c.* 13; 2 *Bl. Com.* 110, &c.

Thus, then, it appears that there never was such an estate as a fee-tail at common law, and that the statute which converted conditional fees into fees-tail, exempted them from forfeiture for a longer period than for the life of the tenant in tail.

But it is further argued, that if not forfeitable by the common law, they became so by the statutes 26 *Hen. VIII.*, *c.* 13,

Den, ex. dem. Hinchman, v. Clark and Zilcar.

§§ 4, 5, and 6; *Edw. VI., c.* 11, § 9.   To this we answer: 1st. These statutes are not the law of New Jersey.   2d. The case before the court does not come within them.

1st. English penal statutes were never supposed to extend to the colonies unless specially named, or extended by the colonial legislature.

The statutes of treason and forfeiture for treason, are proved not to have extended, or were superseded by the treason act of this state, passed October 4th, 1776.   *Wilson's Laws* 4.

The declaration of independence, *ipso facto*, repealed and superseded all the treason acts of Great Britain.   The constitution recognizes only those statutes which are consistent with our independence (§ 22), and it would have been a strange and absurd contradiction at the moment of throwing off our allegiance to that country, to have recognized as law, statutes which, on that very account, subjected us to be considered as rebels and traitors.

But what is decisive upon this question, is this very act of assembly.   If the legislature had considered the statute of Henry in force in this state, it is impossible that they would have passed this act, specifying the objects and limiting the extent of the forfeiture.

2d. This case is not within the provisions of those statutes.   The forfeitures created by them only attach upon convictions at common law, and not to attainders by particular statutes out of the ordinary course of the law.   The case of *Brown* [352] v. *Waite*, which has been already cited, establishes this position, because it was considered necessary to have a special act of parliament to forfeit the estates of Sir John Danvers.

The principal stress of the defendant's argument has been laid upon the proposition which we are next to consider.   It has been alleged that, by the act of December 11th, 1778, John Hinchman, the offender, is declared to have forfeited to the state by his previous conviction, under the act of April 18th, 1778, not only his absolute estates in fee-simple, for

life, years, &c., but also estates belonging to him in tail, so as to cut off the issue in tail to whom that estate was limited after his death.

In considering this question, it is necessary to bear in mind certain rules which have been established for our guidance in the construction of statutes. One of those universally recognized rules is, that a subsequent statute shall not be construed to repeal a prior statute, unless there be either express words of repeal, or an absolute inconsistency between them. 6 *Bac. Ab.* (*Wilson's Ed.*) 373. The law does not favor repeals by implication. *Ibid.* If both acts be merely affirmative, and the substance such that both may stand together, the latter does not repeal the former, but they shall both have a concurrent efficacy. 1 *Bl. Com.* 89, 90.

These rules being borne in mind, it is to be recollected that the statute 13 *Edw.* 1, under which estates tail were created, exempts them from forfeiture. This, then, is the positive language of the prior law, in favor of the issue, and the statute of Henry not applying to this case, the question is whether there be anything in the act of assembly so irreconcilable and repugnant to the statute of Edward as to amount, necessarily, to a virtual repeal of its provisions.

It is not pretended that the statute in question is repealed by any express words in the act, or that estates tail are specially forfeited so as to bar issue. The inquiry, therefore, is whether the words of the two legislative acts are so inconsistent that they cannot exist together, and whether the terms employed by the legislature are so at variance with the rights and interests of the issue in tail as to repeal, by implication, a statute made in their favor. This suggests another rule of [353] construction which should receive the attention of the court, viz., that acts of the legislature are, if possible, to be so construed that the innocent may not suffer, and penal statutes are to be literally and strictly expounded. "Acts of parliament," says Lord Coke, "are to be so construed as no man that is innocent or free from injury or wrong, be, by a literal construction, punished or endamaged." *Co. Litt.* 360,

Den, ex dem. Hinchman, v. Clark and Zilcar.

*a*, § 685. " The rules of the common law will not suffer the general words of a statute to be restrained to the prejudice of a person upon whom a penalty is inflicted; but there are a multitude of cases to show that the general words of a statute ought to be restrained in favor of such person." 6 *Bac. Abr.* 390. Penal statutes are to be construed strictly. *Ibid.* ; 1 *Bl. Com.* 88. In 5 *Burr.* 2739, *Hamilton* v. *Davis,* Lord Mansfield says : " If this was a recent statute, it ought to be construed according to reason and justice. For the court ought not, unless they are absolutely obliged to it, to construe an act of parliament directly contrary to the plain and clear principles of justice and humanity."

Guided, then, by these rules of construction, the statute of Edward, which protects estates in tail for the issue, ought not to be repealed unless by express words, or necessary inference ; and the general words of forfeiture, which may be satisfied by attaching upon the personal interest of the offender, ought not to be carried further to the detriment of the issue. If the act in question is examined with any, even the smallest leaning in favor of the issue, it will be perfectly apparent—

1st. That upon the face of the act, the legislature did not intend to carry the forfeiture further than the interest of the offender.

2d. That none of the expressions in the clause of forfeiture do necessarily attach upon the estate which by the statute *de donis* is vested in the issue.

3d. That these doctrines and opinions in favor of the issue in tail, are confirmed by the entire train of cases and decisions.

1st. From the words employed by the legislature, it is to be presumed that they intended to subject to forfeiture only the proper and absolute estate of the offender.

[354] This intention is to be collected in the first place from the preamble, in which the legislature profess their object to be to do that which is "just and reasonable."

The legislature have expressly restrained the forfeiture to the real estates belonging to the offender. This is a term of

great importance; it is used throughout the act; it has a popular but no technical signification, and the interpretati' that is given it by the court should be conformable to ι. general understanding. But it is by no means a novel doctrine for which we contend, that the inheritance of the estate tail is, both popularly and in the law, considered as belonging to the issue and not to the tenant.

Under the statute of Edward, it was held that the estate should at all events go to the issue if there was any. 2 *Bl. Com.* 112. That can scarcely be said to belong to a man which is so limited as that it must inevitably go to certain specified individuals. See *Co. Litt.* 325, *nota,* 327, *nota; Plowd.* 239, *B.*

The donee has a particular estate called a fee-tail, and donor has the fee expectant. 2 *Bl. Com.* 112.

Under the terms of the statute *de donis,* the land is considered not as *descending* to the issue, but as remaining or reverting. 2 *Reeves' Hist.* 166. This idea, collected from the very words of the statute, contemplates the tenant in possession as merely tenant for life, the remainder being vested by statute in the issue.

A case strongly in point is stated *Co. Litt.* 130, § 199. "Tenant in tail is attainted in a *præmunire:* he shall forfeit the land but during his life, for albeit the statute of 16 *R. II.,* c. 5, enacteth that in that case their lands and tenements, goods and chattels, shall be forfeited to the king, that must be understood of such an estate as he may lawfully forfeit, and that is during his own life; and these general words do not take away the force of the statute, *de donis conditionalibus,* but he shall forfeit all his fee-simple, lands, &c., and so was it resolved in Trudgi*'s case."

The right of the issue in tail, and their protection against forfeiture, rest upon the words of the statute, " the lands shall remain to the issue." *Foster* 99.

[355] From these authorities it appears that by the statute creating estates tail and the decisions under it, it has uniformly been held that the inheritance does not belong to the

donee, that his estate is an estate for life only, and that the inheritance is the property of the issue in tail. (a)

In the same manner is the popular understanding with regard to this estate. It never is understood by any man that anything more belongs to tenant in tail than merely his own life estate in the premises.

With what propriety can that be said to belong to a man which he can neither use, grant, give, devise nor forfeit? If tenant in tail grant all his estate to another, the grantee has an estate only for the life of tenant in tail, but the estate tail is in abeyance. *Litt.*, § 650.

As tenant in tail has power over the inheritance but for his own life, so he can delegate that power to another but for the same time; and, consequently, whatever remains part of the inheritance at the death of the tenant in tail, at which time his power over it ceases, must necessarily go to the heir to whom the inheritance belongs. 2 *Bac. Abr.* 552, 3, *tit.* "*Estate in Tail*," *D.*

The tenant in tail can charge the entail but during his life, because the statute *de donis* preserves it free from all encumbrances for the issue in tail *ut voluntas donatoris observetur.* *Ibid.* Estates tail are of an amphibious nature, participating so much of a fee as to be inheritances, and yet tenant in tail has, in some respects, only an estate for life. *Pigot on Rec.* 6.

It must be perfectly apparent to the court that, as the legislature have forfeited only what belonged to the offender, the estate in tail, so far as it was created for the benefit of the issue in tail by the statute, and so far as it was unalienable by the offender, was not forfeited.

(a) "It is to be observed, that the estate of the tenant in tail, as to his right of possession, or rather as to his beneficial property in the lands, has only a duration for the term of his life." *Co. Litt.* 327, *nota.* A French definition of discontinuance is quoted in the same book, *fol.* 325, as agreeing with that of the English law, "Interruption du droit qu òn a sur un fonds par la vente qu ún autre chargé de conserver ce droit en a faite." *Anciennes Loix des François,* 2 tom. 435.

[356] KINSEY, C. J.

(After reciting the circumstances of the case as detailed in the special verdict.) Before I come to the consideration of the important questions arising in this cause, it may be proper to mention one circumstance, which may, perhaps, prevent future trouble and future disappointment. At the trial of this cause the plaintiff offered to prove, by parol testimony, that at the sale of this property, Clark, the defendant and the purchaser, inquired what estate the commissioners designed to sell; the answer was, an estate for the life of John Hinchman, (the third,) and no more. That the lands were really sold for no more than the life of John Hinchman (the third). The court, however, overruled the testimony, which we are now of opinion was erroneous. We think the plaintiff should have been permitted to produce this testimony to the jury; and that if he could legally prove these facts, no title in fee could be made under a sale of a life estate only, nor should a party be permitted to avail himself of any ambiguity of language, and hold an estate so different from that which he himself intended to purchase, or the commissioners designed to sell.

The principal question argued upon this verdict has been, what estate was forfeited by the judgment on this inquisition? The plaintiff has contended that John Hinchman (the third), being tenant in tail, was incapable of forfeiting anything more than his life estate in the premises. The defendant, on the other hand, maintains that he forfeited all the estate tail created by the will of John (the first); that is, as long as any issue of the body of John (the second) exists.

As to the statutes of 25 *Edw. III.*, 26 *Hen. VIII.* and 33 *Hen. VIII.*, the second of which forfeits estates tail where a man is convicted of treason by the course of the common law alone, they do not appear to me to bear upon the present question further than to show under what words and under what circumstances estates tail have been held to be forfeited in England. They may operate as precedents in construction in analogous cases, but as statutes they have no obligatory

power upon the court in this cause, and afford no rule for its determination.

[357] As to the first of these statutes, that of 25 *Edw. III.*, it is remarked by Lord Coke that its principal benefit was, that it fixed what should be considered as amounting to treason. 2 *Inst.* 2. With respect to forfeitures, it does no more than declare generally that "the forfeiture of the escheats pertaineth to our lord, the king, as well of the lands and tenements holden of others as of himself." From the statute *de donis* in 1285, until the 26 *Hen. VIII*, in 1534, estates tail were never held forfeitable for treason. When that statute was passed, the judges, however unwillingly, were compelled to adopt the construction that estates in tail were forfeited by treason. And if it be considered that the statute in question forfeits all lands in which the offender had any estates of inheritance ; that estates in fee-simple were subjected to forfeiture before the making of the statute ; and that estates tail are estates of inheritance, the absolute necessity of this construction seems apparent. Upon any other construction the statute would have had no effect at all ; and it would have been to declare it useless and invalid, to say that estates in tail were not included.

The case of *Brown* v. *Wait* has been cited, and much relied on. Upon examination, this case seems to have been decided nearly on the same grounds as those which I have stated, as compelling the construction that was given to the statute of 26 *Hen. VIII.* There was evidently a strong repugnance in the court to consider the estate tail of Sir John Danvers to be forfeited, but they were compelled to adopt this construction, or the statute would, as Ventris, in his report of the case, says, "have signified nothing at all." The judges said that the statute took notice that Sir John was dead—of course he could not have an estate for life, subject to forfeiture ; but there is certainly ground to infer from the language of the court, that if he had been alive, and could have forfeited an estate for life, so that the statute might have

had some object, and its provisions been not absolutely nuga-
tory, the determination would have been different.

From these circumstances and observations the following
inferences may be drawn : That the judges on statutes so
highly penal, have not been readily induced to pronounce
es-[358]-tates tail forfeited for treason, even when those
judges have been wholly in the power of the government,
and were strongly interested to give judgments so consonant
to the wishes of the crown, general words have not been
deemed sufficient in any case, except where the construction
was necessary to prevent the statute from being wholly in-
operative.

This case, however, depends neither upon the English
statutes, nor upon the construction which judges have
passed upon them, but on an act of assembly of our own
state, and upon the design and intention of the legislature,
either clearly expressed, or unavoidably and necessarily im-
plied—an intention to be collected from the whole statute,
taken in a connected point of view, and considered in all
its parts, not by remarking on general expressions, without
considering them as constituting only a part of an entire law.
Our object, therefore, is to examine this act of assembly, and
from its various parts to deduce as far, and with as much
precision as possible, the design and intentions of those by
whom it was framed.

The law in question is inaccurately drawn, and at the
same time is highly penal; so much so, indeed, as to be in-
capable of being supported upon any principles of law or jus-
tice.   To prove this it is only necessary to recall to mind the
character of the contest in which we were engaged, and the
changes that had occurred since its commencement.   The
legislature go back to the origin of the war, to a period when
congress, and almost all their constituents, considered them-
selves as British subjects, professing allegiance to the king,
to whom they uniformly said, "govern, but do not oppress
us;" the legislature go back to this period when, according
to the law of nature and of nations, every individual had a

perfect right to choose his party and join which side he pleased, and pronounce a sentence of severe and indiscriminate condemnation upon all who joined the armies of the British, either here or elsewhere, and subjecting their property to a total and absolute forfeiture; such a law should, therefore, be construed strictly, and certainly should never be extended further than the words express or unavoidably imply.

In the first section of the act the legislature begin with general words, "all and singular the lands, tenements, and [359] hereditaments," expressions evidently rather to be considered as descriptive of the things intended to be forfeited, than of the interest in them. These words are certainly not more comprehensive than those used in the statute of 25 *Edw. III.*, which were never construed to include an estate tail. But, admitting that if they stood alone, they might be presumed to comprehend estates tail, the words immediately succeeding, in the same sentence, "held in fee or for term of life," restrict the preceding general words, and limit their extension to lands held in fee or for life. As these words stand connected together, no court of justice could have supposed that the legislature designed to forfeit an estate tail. Arguments, therefore, drawn from single, unconnected words and expressions, of which we have had too many on this occasion, have no weight with me.

The general words which follow, viz., " All the estates real, of what nature or kind soever, belonging to the offender," are equally ineffectual to forfeit an estate tail. These general words ought not, according to the received rules of construction, to be construed to extend to anything of a higher nature than the next antecedent, which is an estate for life. The doctrine that has been cited from Bacon is unquestionable, that general words are not to be extended to give a penalty, but they are to save one.

In many cases, and to many purposes, the estate of the tenant in tail is no more than an estate for life. The act of assembly which makes lands chattels for the payment of

debts, says that the hereditaments, real estates, houses, and lands of the debtor, shall be chattels for the payment of debts, and yet an estate tail has never been held liable to be sold further than for the life of the debtor; and, in the opinion, I should presume of every man, a creditor comes forward in a manner equally entitled to the favor of the law, and better founded in equity, and may with more justice and propriety claim a liberal extension of the words of the law towards him than a state, when demanding a forfeiture.

It may be objected that tenant in tail is, in fact, as much an owner of the estate as tenant in fee, because he may, at his pleasure, dock the entail, and vest himself with the absolute [360] fee. In my opinion, it would be a sufficient answer to all this to say, it is true he might have done all this, and might have acquired a more unlimited right over his property, but he did not; and we are considering, not what estate he might, under certain circumstances, have acquired, but what he actually and in fact possessed. With equal reason, it might be contended that, whenever a man has a right of action for lands, or right of entry, either of which, if properly pursued, would reduce that estate into possession, these should be forfeited for treason, and that the state should not suffer because he would not do what he might have done. But the determinations have been otherwise: neither are forfeited. Judges have not been fond of extending these statutes further than they were compelled to, and these interests were not embraced by the words of the law.

There is nothing in any part of this act which shows an intention to forfeit any estate but what the offender had the right of selling and disposing of absolutely.

When he has that absolute power, there seems more reason to forfeit the estate, though his children should suffer in consequence; but where a man is seized in tail by the gift of his ancestor, he cannot sell or dispose of it, nor can he do any act while the entail continues to deprive his children of it, according to the directions of the ancestor. Why, then, or upon what principle, can he, by any act of his, forfeit or convey

this property to the state, not only to his prejudice, but to the prejudice of others who do not claim from him, but derive their right from the same fountain whence his title originated, from the deed of their common ancestor? We think, therefore, that, to declare that the inheritance in this case was forfeited, would be giving to this act a construction far more extensive than we are warranted in doing by the words of it.

What confirms me in this opinion, that the legislature never intended to forfeit an estate tail for a longer period than the life of the tenant committing the offence, is the language employed in a subsequent part of the law. The tenth section directs all forfeited estates to be sold by the commissioners in their own name by a deed poll, and adds that such deed shall [361] convey all the right and title which the offender had at the time of the commission of his crime. It then proceeds to state what they mean by the estate of the offender, and says the purchaser shall have, hold, and enjoy the bargained premises as fully as the offender held, or might, or ought to hold the same. Clark bought this right and no more. It may be proper also to remark in this place, that the estate which he purchased was the estate which John Hinchman (the third) had at the time the offence was committed, and not the estate, which, had he continued seized for several years longer, he would have been entitled to under an act of assembly, passed at this subsequent period, enlarging estates tail.

In acts of a nature similar to this which we have been considering, and under which this forfeiture was had, where a person may be convicted of the crime imputed to him and forfeit his estate without notice, and without an opportunity of being heard in his defence, power puts on her severest countenance. If it be right in any case to extend punishment beyond the delinquent himself, and to deprive a child of that right which the laws of every civilized country have bestowed, and a power superior to all human institutions nature has sanctioned to succeed to the estate of his parent, surely it never should be done except where the law is clear

and explicit. Where the law is in any degree ambiguous, and will admit of two constructions, one consonant to justice and humanity, the other contrary to these principles, it never should be done. Judges in the worst of times have been ashamed to do what we are called upon to do, unless where the construction was forced upon them, and was unavoidable. Let us not, in this government professedly founded upon the rights of human nature, begin our administration of justice with the doctrines and maxims which sometimes dishonored the character of the nation from which we and our institutions have alike sprung; and let us never, if it can be avoided, involve innocence in those punishments, and subject it to those penalties which should be reserved exclusively for the head of the guilty.

We are therefore unanimously in favor of entering judgment for the plaintiff.

CITED *in Den* v. *Dubois,* 1 *Harr.* 285; *Den* v. *Robinson,* 2 *South.* 715.